## UNITED STATES DISTRICT COURT
### IN THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

BAE INDUSTRIES, INC., a Michigan
corporation,

       Plaintiff,                 Case No.

vs.

WHITESELL CORPORATION, an Alabama
corporation, and WHITESELL
INTERNATIONAL CORPORATION, an
Alabama corporation,

       Defendants.

_____

Marilyn A. Peters (P32095)
Laura C. Baucus (P56932)
William J. Hallan (P70993)
Dykema Gossett PLLC
Attorneys for BAE Industries, Inc.
39577 Woodward Avenue, Suite 300
Bloomfield Hills, MI 48304
(248) 203-0768/ 203-0796
mpeters@dykema.com
lbaucus@dykema.com
whallan@dykema.com

_____

DYKEMA GOSSETT•A PROFESSIONAL LIMITED LIABILITY COMPANY•39577 WOODWARD AVENUE•SUITE 300•BLOOMFIELD HILLS, MICHIGAN 48304

## PLAINTIFF BAE INDUSTRIES, INC'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Plaintiff, BAE Industries, Inc, ("BAE"), by its counsel Dykema Gossett PLLC, requests the entry of a temporary restraining order and preliminary injunction compelling defendant Whitesell Corporation ("Whitesell"), to continue shipping certain unique and critical automotive parts (the "Parts") during the pendency of this matter, or until BAE can secure alternative suppliers for the same. BAE seeks this relief to avoid irreparable and catastrophic harm including, but not limited to, the shut down of its production facilities in Auburn Hills and Warren, Michigan within days - a week at best, causing irreparable harm to BAE, to BAE's Tier

I customers, and the original equipment manufacturers (OEMs), which utilize and incorporate Whitesell's unique Parts in the ultimate product – numerous vehicle makes and models.

For these reasons, and as more fully discussed in the attached brief in support of its Motion for Temporary Restraining Order and Preliminary Injunction, BAE respectfully requests that this Court grant its Motion and enter a Temporary Restraining Order and Order Setting Hearing on Preliminary Injunction. *See* the proposed order submitted to this Court electronically.

BAE gave notice of this lawsuit and motion to the representatives of Whitesell on the day of filing, pursuant to Fed. R. Civ. P. 65(b) via email and facsimile to representatives of Whitesell, Mr. Neil Whitesell and Mr. Steve Semmler.

Respectfully submitted,

DYKEMA GOSSETT PLLC

By: **s/Marilyn A. Peters**
    Marilyn A. Peters (P32095)
    Dykema Gossett PLLC
    Attorneys for BAE Industries, Inc.
    39577 Woodward Avenue, Suite 300
    Bloomfield Hills, MI 48304
    (248) 203-0768
    mpeters@dykema.com

Date: October 22, 2008

DYKEMA GOSSETT•A PROFESSIONAL LIMITED LIABILITY COMPANY•39577 WOODWARD AVENUE•SUITE 300•BLOOMFIELD HILLS, MICHIGAN 48304

**BAE INDUSTRIES INC'S BRIEF IN SUPPORT OF ITS MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

**QUESTION PRESENTED**

Should the Court issue a Temporary Restraining Order and Preliminary Injunction compelling Whitesell Corporation ("Whitesell") to continue shipping automotive parts and performing its contracts with BAE where: (i) Whitesell has threatened to stop (and has actually stopped) shipping certain critical automotive parts which will cause BAE and its customers irreparable harm; (ii) Whitesell's threats constitute a clear breach of the contracts between the parties; (iii) injunctive relief is in the public interest because a shut down of BAE plants will result in irreparable harm to BAE, its employees, its customers and their employees, and numerous other companies and individuals in the automotive industry; and (iv) Whitesell will not be harmed if the Court enters an injunction?

BAE says:            Yes
Whitesell says:       No

**I.      INTRODUCTION AND SUMMARY**

This dispute arises out of Whitesell's pattern and practice of breaching its contracts with BAE, and then threatening to cease shipment (and actually stopping shipment) of certain unique automotive parts which it supplies to BAE, unless BAE succumbs to its demands and relinquishes its legal and contractual rights. **This is not a case where Whitesell simply is demanding more money for the parts before it will ship. If that were the case, then BAE could offer to pay the additional money under duress and under protest, in order to secure the delivery of the parts until it could locate new suppliers. Indeed, BAE is already paying higher prices for the parts under duress.** Here Whitesell is refusing to ship the parts to BAE after this **Thursday, October 23, 2008,** unless BAE executes what Whitesell has referred to as a "Supply and Requirements Agreement," which would permit Whitesell to (i) modify prices for

1

the parts it sells to BAE unilaterally, (ii) terminate its obligation to supply the parts at any time, without remedy to BAE, and (iii) force BAE effectively to waive its legal rights against Whitesell, among other things.  Whitesell's actions and demands are in bad faith.  Notably, this is not the first time Whitesell has stopped shipment of the parts in order to extort money or other terms from BAE.  On June 13, 2008, Whitesell ceased shipment of the parts to BAE, in violation of its contracts and threatening BAE with irreparable harm, until BAE agreed to pay it increased prices, which BAE has been paying, under protest, since that time.

Whitesell's cessation of shipment of its parts will cause immediate and irreparable harm to BAE.  It is the sole source of the parts, which underwent a rigorous design and validation process before being utilized.  Cessation of shipment will cause production line shut downs at BAE's production facilities in Auburn Hills and Warren, Michigan, potential employee lay offs, as well as potential shut downs and employee lay offs at BAE's Tier I customers and the original equipment manufacturers ("OEMs") which manufacture the numerous vehicles which incorporate the unique Whitesell and BAE parts.  Other vendors whose parts are used by BAE's Tier I customers and the OEMs also likely will be negatively impacted.  Thus, Whitesell's improper actions will cause a negative ripple effect throughout the automotive industry – already facing very challenging times.  Whitesell's threats, demands, and actions justify a temporary restraining order and preliminary injunction, for at least the following reasons:

- *First*, BAE will be **irreparably harmed** if Whitesell ceases shipment of its parts because BAE will be forced to idle assembly lines, potentially lay off employees and will suffer the loss of reputation and goodwill in the industry.  BAE's Tier I customers and the OEMs, which incorporate the unique Whitesell and BAE parts in numerous vehicles, also will suffer irreparable harm, including potential line shut downs and lay offs.  BAE cannot immediately obtain its full requirements of the parts from any other source.  Because the parts are unique and subject to the production part approval process, it will take at least three to six months to identify and validate new suppliers capable of producing BAE's requirements.

2

- *Second*, BAE has a **substantial likelihood of prevailing on the merits**. The contracts in question are valid, enforceable requirements contracts that obligate Whitesell to supply BAE with 100% of BAE's needs for the parts. Further, it cannot be disputed that even if Whitesell was permitted to terminate its relationship with BAE (which BAE contests), that Whitesell failed to provide BAE with sufficient notice of termination under the law.

- *Third*, Whitesell will not be harmed by an injunction because it would merely preserve the *status quo*, and Whitesell to do what it is already obligated to do - perform under the contracts pursuant to a lengthy course of performance. **The balance of potential harms tips decidedly in BAE's favor** because if Whitesell stops supplying the parts, plants will be forced to shut down within days. On the other hand, Whitesell would continue to be paid for the parts, and in the unlikely event that Whitesell's termination of its contract with BAE is found to be permissible, Whitesell could be adequately compensated by monetary damages.

- *Fourth*, the **public interest weighs heavily in favor of BAE** because of the devastating and almost immediate harm to the public, including (i) line shut downs and potential lay offs of assembly line workers at BAE, the Tier I customers and the OEMs, (ii) the termination of the supply to BAE's Tier I customers and the OEMs which incorporate the unique Whitesell and BAE products in their vehicles, and without which the vehicles cannot be produced, and (iii) the negative effect on other automotive suppliers which also supply parts and components for the vehicles at issue.

## II.    FACTUAL BACKGROUND[1]

### A.    The Parties

BAE is a Tier II automotive supplier engaged in the business of manufacturing and assembling certain latch mechanisms which it supplies to its Tier I customers, including Lear Corporation ("Lear"), Johnson Controls, Inc. ("JCI") and Setex Corporation ("Setex"). These Tier I customers then incorporate the BAE latch mechanisms in certain completed seats which are shipped to the to certain "OEMs" (which are defined in the Complaint). The OEMs use the seats containing the BAE parts in numerous "Vehicles" (which are defined in the Complaint). Whitesell is a Tier III automotive supplier engaged in the business of manufacturing fastening systems and cold formed steel products. Here, Whitesell supplies approximately 52 small cold

---

[1] All of the facts in the Brief have been verified pursuant to the Verified Complaint.

3

DYKEMA GOSSETT•A PROFESSIONAL LIMITED LIABILITY COMPANY•39577 WOODWARD AVENUE•SUITE 300•BLOOMFIELD HILLS, MICHIGAN 48304

headed parts to BAE ("Parts").  A list of the Parts at issue is attached as Exhibit 1.

**B.      The "Automotive Supply System":  Just-in-Time Inventory, Sole Source Suppliers, And The Validation Process For The Parts**

Consistent with the customary automotive supply chain system, BAE operates on a "single-source, just-in-time" inventory supply system basis ("Automotive Supply System").  The Automotive Supply System is standard in the automotive industry and is used by Whitesell, BAE, Lear, JCI, Setex and the OEMs, as well as all other suppliers in the automotive supply industry, with few exceptions.  Consistent with the Automotive Supply System, Whitesell is the single source of the Parts, which are used by BAE in its latch mechanisms, which are incorporated in certain seats manufactured by BAE's Tier I customers, and then into the Vehicles manufactured by the OEMs.  Simply stated, without Whitesell's Parts, BAE cannot manufacture its latch mechanisms and the Vehicles into which they are incorporated cannot be completed.

Pursuant to the Automotive Supply System, each entity throughout the supply chain maintains limited inventories, and relies on frequent shipments of its required parts in order to meet its and its customers' production needs.  Thus, any failure to supply parts as ordered could quickly shut down assembly plants both up and down the supply chain.  Here, consistent with the Automotive Supply System, BAE maintains a very limited inventory of the Parts (*i.e.*, typically not sufficient for more than two or three days, a week at best), and maintains a very limited inventory of the latch mechanisms incorporating the Parts that it sells to its Tier I customers.

The Parts are manufactured to meet the strict quality and safety standards of BAE, as well as applicable safety standards, and therefore are not readily available to BAE from alternative suppliers.  Specifically, the Parts underwent the rigorous design, development and production parts approval process (hereinafter "PPAP"), in order to be validated before they could be utilized in BAE's latch mechanisms, in the Tier I customers' seats, and ultimately in the

DYKEMA GOSSETT·A PROFESSIONAL LIMITED LIABILITY COMPANY·39577 WOODWARD AVENUE·SUITE 300·BLOOMFIELD HILLS, MICHIGAN 48304

4

Vehicles.  In order for BAE to obtain an alternate source of supply for the Parts, a prospective

vendor must go through design, development, and PPAP.  Because of the Automotive Supply

System and the required PPAP validation process, new suppliers for the Parts cannot be obtained

within days or even weeks.  It would take BAE at least three to six months in order to identify

and validate new suppliers.  BAE is in the process of attempting to obtain alternative suppliers,

but that will take months.[2]  Thus, it requires shipment of the Parts until that process is completed.

## C.    The Parties' Contracts

From 2000 through 2006, BAE entered into requirements contracts with Technifast

Industries, Inc. ("Technifast"), whereby Technifast would supply BAE the Parts at fixed prices.

The requirements contract documents included, among other things, BAE purchase orders and

releases issued against the same.  The requirements contracts with Technifast also included and

were governed by BAE's Terms and Conditions for Purchase Orders ("BAE's Terms and

Conditions," Exhibit 4).  BAE's standard purchase order provides: "This purchase order is

---

[2]  Whitesell uses a cold headed process to manufacture the Parts.  This cold headed process must be used in order to produce the volume of Parts BAE requires.  It will take BAE at least three to six months to identify and validate new suppliers to produce the Parts using this cold headed process.  In an attempt to postpone the catastrophe that is inevitable without Whitesell's continued supply of Parts and to allow adequate time for the legal process to ensue, BAE is attempting to locate alternate interim sources for the Parts, which use varying methods of production (i.e., not the cold headed process).  However, these varying manufacturing methods are not capable of producing the volume of Parts required by BAE, leaving BAE without sufficient Parts to meet its (and therefore its customers') requirements.

Further, BAE is obligated pursuant to its contracts with its customers to only use validated parts in its latch mechanisms.  This validation process is used throughout the automotive industry to ensure the safety of the vehicles.  Therefore, using non-validated parts from an interim alternative source in not an acceptable solution here because it would place BAE in jeopardy of breaching its own contracts with its customers.  And, in any event, the interim alternative sources (which do not use the cold headed process), cannot produce the sheer number of Parts BAE needs.  Therefore, utilizing these sources will only serve to delay the inevitable shut downs that will occur when BAE is unable to produce and ship its customers' requirements.  As a result, BAE and its customers will suffer irreparable harm if Whitesell is not compelled to ship its Parts during the pendency of this litigation, or until BAE can identify and validate new suppliers to produce the Parts using the cold headed process.

DYKEMA GOSSETT•A PROFESSIONAL LIMITED LIABILITY COMPANY•39577 WOODWARD AVENUE•SUITE 300•BLOOMFIELD HILLS, MICHIGAN 48304

governed by the BAE Supplier Manual and BAE Standard Terms and Conditions for Purchase Orders which can be found on the BAE website BAEIND.com." Beginning in 2006, BAE issued its Requests for Quotes ("RFQ") through a computerized system which expressly states that BAE purchase orders are governed by BAE's Terms and Conditions.

On or about August 1, 2005, BAE and Technifast entered into a certain long term agreement extending through 2010 covering all Parts (the "Technifast LTA"). The Technifast LTA entails a purchase earned discount program providing, among other things, that BAE would be entitled to certain discounts if it purchased specific volumes of the Parts. In essence, the Technifast LTA agreement provided that the more Parts BAE purchased, the greater price discount it would receive. *See* Technifast LTA, Exhibit 2.

In approximately 2006, Whitesell acquired certain assets of Technifast. Through Whitesell's acquisition, Whitesell became the successor in interest to and bound by Technifast's contractual obligations to BAE. After its acquisition of the Technifast assets, Whitesell continued to supply the Parts to BAE pursuant to BAE's requirements contracts with Technifast, including BAE's purchase orders, releases and BAE's Terms and Conditions. After Whitesell purchased Technifast, BAE changed the vendor's name on the purchase orders to Whitesell, and Whitesell shipped Parts against such purchase orders. *See, e.g.,* Purchase Order No. 9380 identifying Whitesell as the vendor, attached as Exhibit 3. Thus, as a result, BAE and Whitesell directly entered into contracts for the Parts. (Later, the pricing on Purchase Order No. 9380 was modified to reflect the 4% price reduction in August, 2007, pursuant to the Technifast LTA.) Additionally, BAE issued various purchase orders over the years covering the Parts, with several different purchase order numbers, in accordance with BAE's internal part management system. In October, 2007, BAE issued Purchase Order No. 33113, consolidating all of the Parts on one

DYKEMA GOSSETT•A PROFESSIONAL LIMITED LIABILITY COMPANY•39577 WOODWARD AVENUE•SUITE 300•BLOOMFIELD HILLS, MICHIGAN 48304

purchase order, a change made for BAE's internal convenience.

Whitesell is obligated and bound by the Technifast LTA.  Language incorporating the Technifast LTA was incorporated on BAE's purchase orders to Technifast, as well as purchase orders issued directly to Whitesell and against which Whitesell shipped Parts, including without limitation Purchase Order Nos. 9380 and 33113.  Whitesell also accepted discounted payments from BAE pursuant to the Technifast LTA.  Since its acquisition of the Technifast assets, Whitesell has been awarded new business which is also governed by the requirements contracts.

The following documents constitute the requirements contracts between BAE and Whitesell, and are referred to as the "Contracts" throughout the remainder of this pleading:

- the BAE purchase orders issued to Technifast (and issued to Whitesell directly), and purchase orders including the six additional Parts sourced with Whitesell subsequent to Whitesell's purchase of the Technifast assets, BAE's releases issued against such purchase orders, and the BAE Terms and Conditions; and

- the Technifast LTA between BAE and Technifast.

Pursuant to the Contracts, the Parts are subject to fixed prices identified on the BAE purchase orders, subject to the Technifast LTA price reductions.  Not only is Whitesell bound by the Contracts due to its acquisition of the Technifast assets, but also Whitesell is bound by the Contracts in its own regard due to its performance of the contracts.  Each purchase order states:

> This Purchase Order is an offer to Seller by Purchaser (BAE industries, Inc.) to enter into a Requirements Contract as defined by the Uniform Commercial Code, as adopted in Michigan pursuant to MCLA 440.2306 et. seq., as amended (hereinafter the Purchase Order).  **Seller shall accept this Purchase Order either in writing or upon the commencement of any work or performance of any service, which shall constitute Seller's acceptance of all the terms and conditions contained herein**. (emphasis added).  *See* BAE Terms and Conditions, ¶I, Exhibit 4.

Whitesell performed against such purchase orders and thus accepted their terms.  As further evidence that Whitesell knows it is bound by the Contracts, including the Technifast

DYKEMA GOSSETT•A PROFESSIONAL LIMITED LIABILITY COMPANY•39577 WOODWARD AVENUE•SUITE 300•BLOOMFIELD HILLS, MICHIGAN 48304

LTA, Whitesell has performed under the Technifast LTA, including giving discounts to BAE.

**D.     Whitesell's Unilateral Demand For Price Increases**

On May 29, 2008, Matt Johannessen of Whitesell sent a letter to Derek Davis of BAE demanding price increases for the Parts, purportedly due to the increased cost of raw materials. *See* May 29, 2008 Letter, Exhibit 5.   Inexplicably, Whitesell's May 29th letter enclosed a document entailed "Customer Quotation," as if Whitesell was quoting work when in fact it already was bound by the Contracts.   This Customer Quotation document included a list of across the board price increases for the Parts.   Whitesell also enclosed its terms and conditions, unilaterally demanding that BAE accept its terms, which is not permitted under the Contracts.

In its May 29, 2008 letter, and in other discussions between BAE and Whitesell representatives, Whitesell threatened to disrupt the supply of the Parts to BAE unless BAE agreed to its demands.   In its May 29th letter, Whitesell threatened that BAE needed to confirm its acceptance of the improperly demanded price increases and revised terms and conditions "to avoid any potential associated supply disruptions."  *See* May 29, 2008 Letter, Exhibit 5.

On June 3, 2008, Derek Davis of BAE responded to Matt Johannessen of Whitesell's May 29th letter, stating that while BAE was willing to discuss the current market costs of the raw materials needed for the Parts, the May 29th letter was, in effect, "a request to terminate or amend our current Purchase Order Contracts.   Some of these aforementioned contracts have been in place and used for over 4 years.   Our current Requirements based Purchase Order Contracts make no provisions for Metal Market, Currency or Economical adjustments."  *See* June 3, 2008 Letter, Exhibit 6.  The same letter also advised Whitesell that BAE would not modify any other Contract terms, including the BAE Terms and Conditions.   BAE made various attempts to discuss Whitesell's demands subsequent to its June 3, 2008 letter, however, Whitesell refused to discuss its demands or its obligations pursuant to the Contracts.   In violation of its obligations

8

under the Contracts, Whitesell did stop shipment of the Parts to BAE as of June 13, 2008.

**E.      BAE Pays The Increased Prices Under Protest**

After Whitesell stopped shipment of the Parts, BAE had no choice but to accede to Whitesell's improper demands, under duress and under protest reserving all rights, in order to avoid the irreparable harm described above.  Thus, in order to obtain shipment, on June 17, 2008, Derek Davis of BAE sent a letter to Matt Johannessen of Whitesell, stating that BAE has issued a revised purchase order reflecting the increased prices for the Parts, but that such purchase order was being issued "under duress" and that BAE "reserves all of its rights and remedies under its existing Purchase Order(s)/contract(s)" (the "Under Protest Purchase Order").  *See* June 17, 2008 Letter, Exhibit 7 and Under Protest Purchase Order No. 34873, Exhibit 8.

On or about June 18, 2008, Steve Naseef of Whitesell responded via letter to Derek Davis of BAE, stating that Whitesell would not ship the Parts pursuant to the Under Protest Purchase Order.  In sum, Whitesell demanded that the under protest language be eliminated from the Purchase Order.  Essentially Whitesell was attempting to force BAE to waive its legal rights in order to secure shipment of the Parts.  In its June 18th letter, Whitesell stated that it would not supply Parts unless BAE explicitly accepted the higher prices and all of Whitesell's terms and conditions.  *See* June 18, 2008 Letter, Exhibit 9.  Left with no alternative, and only to avoid the irreparable harm which would result from Whitesell's failure to ship the Parts, BAE issued a new purchase order that included Whitesell's demanded language.  *See* Revised Purchase Order No. 34873, Exhibit 10.  BAE took such actions under duress and under protest.

**F.      Whitesell's Second Threat To Cease Shipment Of The Parts And
          Its Attempts To Terminate The Parties' Contracts**

Since June, 2008, BAE has paid Whitesell's price increases under duress and under protest, however, on or about September 4, 2008, only months after receiving the Revised

9

Purchase Order it demanded, Whitesell advised BAE that it expected it to enter into what Whitesell refers to as a "Supply and Requirements Agreement," attached as Exhibit 11. Thus, mere months after refuting its Contract obligations and forcing BAE to agree to its terms, Whitesell refuted those contracts and demanded even more.

When BAE refused to succumb to Whitesell's unilateral demand to enter into the Supply and Requirements Agreement, Steve Semmler of Whitesell sent Derek Davis of BAE a letter purporting to terminate the relationship between the parties, dated September 23, 2008. Whitesell further stated that it would only supply the Parts to BAE through October 23, 2008. *See* September 23, 2008 Letter, Exhibit 12. In order to terminate its relationship with BAE, Whitesell purportedly relied upon Whitesell's terms and conditions, which, pursuant to paragraph 10, permits the seller to terminate a contract for convenience upon notice to the buyer. *See* Whitesell's Terms Conditions, ¶10, Exhibit 13. However, Whitesell's terms and conditions never became part of the parties' Contracts. Whitesell is not permitted under the Contracts or the law to impose its terms on BAE unilaterally or to rewrite the parties' Contracts. Therefore, the revisions made by BAE in Revised Purchase Order 34873, attached as Exhibit 10, as well as the price increases paid by BAE in connection with the same, are not binding on BAE as they were made under duress and under protest with BAE reserving all rights against Whitesell.

Nevertheless, even if Whitesell's terms and conditions, including ¶10, were applicable, Whitesell breached such terms because the thirty day notice it provided in its September 23, 2008 letter does not provide sufficient notice to BAE as required by law. Under the law, Whitesell is obligated to provide BAE with reasonable notice, which here, would be notice sufficient to permit BAE to identify and validate new suppliers for the Parts, which will take at least three to six months. On October 21, 2008, BAE sent Whitesell a letter, notifying Whitesell

10

2:08-cv-14497-AC-DAS   Doc # 2   Filed 10/22/08   Pg 13 of 22   Pg ID 106

that it was in breach of the Contracts, demanding that Whitesell provide BAE with adequate assurances of performance through their term, and otherwise demanding that Whitesell confirm that it will ship the Parts ordered by BAE.  *See* October 21, 2008 Letter, Exhibit 14.  To date, Whitesell has failed and refused to confirm that it will ship the Parts after October 23, 2008.

Because of Whitesell's continuous breaches of the Contracts, it has effectively repudiated such Contracts.  Accordingly, BAE is diligently working to identify and validate new suppliers for the Parts.  As discussed above, it will take BAE at least three to six months to identify and validate new suppliers.  Further, BAE will be forced to incur substantial costs as a result of Whitesell's repudiation of the Contracts, including costs to resource the Parts with new suppliers.

## III.    ARGUMENT

### A.    Standard For Injunctive Relief

The fair solution here is to maintain the *status quo* while the parties' underlying disputes are resolved.  The purpose of a preliminary injunction is to preserve the status quo between the parties pending a final determination on the merits.  *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Grall*, 836 F. Supp. 428, 431 (W.D. Mich. 1993).  The United States Court of Appeals for the Sixth Circuit has held that a court should consider four factors in deciding whether to issue a preliminary injunction under FED. R. CIV. P 65(a):  (1) The likelihood of plaintiff's success on the merits; (2) whether the injunction will save plaintiff from irreparable injury; (3) whether the injunction would substantially harm others; and (4) whether the public interest would be served by the injunction.  *In re Delorean Motor Co.,*755 F.2d 1223, 1228 (6th Cir. 1985); *Leary v. Daeschner*, 228 F.3d 729, 736 (6th Cir. 2000).

These factors are not prerequisites to issuing an injunction; but, rather, they are factors to be balanced.  *Sandison v. Michigan High School Athletic Ass'n*, 64 F.3d 1026, 1031 (6th Cir. 1995).  Furthermore, "the request for a preliminary injunction is evaluated on a sliding scale

DYKEMA GOSSETT•A PROFESSIONAL LIMITED LIABILITY COMPANY•39577 WOODWARD AVENUE•SUITE 300•BLOOMFIELD HILLS, MICHIGAN 48304

approach, so that in an extreme case 'if that balance is struck in favor of the Plaintiff, it is enough that grave or serious questions are presented; and Plaintiff need not show a likelihood of success.'"  *Avedisian v. Holcomb*, 853 F. Supp. 185, 187 (E.D. Va., 1994); *see also* 42 Am. Jur. 2d Injunctions 16 ("[I]f the balance of harm is sufficiently one-sided, a movant at the preliminary injunction stage may not even be required to prove that he or she is more likely to prevail than not").  In the present case, the facts, especially when considering the severe and irreparable harm to BAE, its Tier I customers, and the OEMs, overwhelmingly demonstrate that a preliminary injunction should be issued.

**B.     The Harm To BAE From A Shutdown Will Be Irreparable**

BAE will be irreparably harmed should an injunction not issue compelling Whitesell to continue supplying the Parts during the pendency of this matter.  As detailed above, under the Automotive Supply System, BAE maintains a limited inventory of the Parts, and Whitesell is BAE's sole source for the same.  BAE likewise maintains a very limited supply of the specific latch mechanisms which it sells – again as the sole source – to its Tier I customers Lear, JCI, and Setex, which then incorporate the BAE latch mechanisms in certain seat assemblies which they sell, as the sole source, to the OEMs.  Thus, without the Parts, the Vehicles in which the Parts are ultimately installed cannot be completed.

Simply stated, due to Whitesell's stoppage in shipments, BAE is estimated to run out of Parts within a few days, a week at best, potentially idling BAE assembly lines, plants, and workers.  Without the Parts, BAE cannot produce its latch mechanisms, and therefore its Tier I customers, which must have BAE's products to manufacture certain seat assemblies, will face the same circumstances – potential production line shut downs and lay offs – shortly thereafter. Finally, the OEMs which manufacture the Vehicles which contain BAE's latch mechanisms (and therefore Whitesell's Parts) likewise will face the same fate shortly thereafter – potential

DYKEMA GOSSETT•A PROFESSIONAL LIMITED LIABILITY COMPANY•39577 WOODWARD AVENUE•SUITE 300•BLOOMFIELD HILLS, MICHIGAN 48304

production line shut downs and lay offs.  Furthermore, the irreparable harm will not be limited to BAE's customers or the OEMs.  Indeed, if the Vehicles cannot be manufactured by the OEMs, then automobile dealers and consumers will be adversely affected, as well as other suppliers which produce numerous other components for these Vehicles, which will have their orders diminished or ceased while production is halted, thereby affecting their businesses, plants, and employees.  In sum, the ripple effect that will be caused by Whitesell's cessation of shipment likley will have a devastating impact on the automotive supply chain.  Finally, if Whitesell ceases shipment, and BAE is unable to ship its latch mechanisms to its Tier I customers, BAE will suffer harm to its reputation in the industry as well as a loss of good will.

Because of the immediate and catastrophic harm caused by any interruption in the shipment of parts in the Automotive Supply System, courts in this State routinely have granted injunctive relief compelling production to prevent the devastating harm caused by the cessation of shipment, including the shut down of manufacturing and assembly plants:[3]

- *Intertec Systems v. Multimatic, Inc,* Case No. 04-CV-736661-DT (E.D. Mich., Oct. 14, 2004), Exhibit 15.  Judge Cleland granted injunctive relief preventing the cessation of shipment and ordering shipment of product to continue during the lawsuit.  In granting that relief, Judge Cleland noted the particular irreparable harm, and domino effect of that harm that would occur with cessation of shipment in the automotive industry, stating that "the ceasing of shipments in the automobile industry can wreak particular havoc" and may result in "immediate and dramatic consequences," (*citing Kelsey-Hayes Co v. Galtaco Redlaw Castings Corp*, 749 F. Supp. 794, 798 (E.D. Mich. 1990)).  *Quoting In re Autostyle Plastics, Inc,* 216 BR 784 (Bankr. W.D. Mich. 1997).  Judge Cleland also noted that cessation of supply would result in "a shut down of certain assembly lines while Chrysler and other customers obtained new suppliers and made the necessary arrangements for new production tooling and dies.  In turn, these shut downs might cause the layoff of innumerable employees of Chrysler and Debtor's other customer…."

---

[3] The UCC recognizes that in situations such as the present case, where the goods are unique, and therefore, cover is not feasible, the plaintiff may obtain specific performance from defendant compelling it to ship the unique goods.  *See* MCL § 440.2716

DYKEMA GOSSETT•A PROFESSIONAL LIMITED LIABILITY COMPANY•39577 WOODWARD AVENUE•SUITE 300•BLOOMFIELD HILLS, MICHIGAN 48304

- *Montupet Limitee v. Goertze + Schiele Corp*, Case No. 07-081402-CK (Oakland County Circuit Court), Exhibit 16. Judge Rae Lee Chabot issued a temporary restraining order in similar circumstances and, on July 11, 2007, a Preliminary Injunction, compelling a Tier II supplier to continue to produce parts and comply with its contracts with the plaintiff, which is a Tier 1.

- *DaimlerChrysler Corporation v. Lear Corporation*, Case. No. 05-070865-CK (Oakland County Circuit Court), Exhibit 17. Judge O'Brien granted a temporary restraining order in similar circumstances where the supplier was demanding modifications to the parties' contract (there, price increases). In that case, DaimlerChrysler Corporation ("DCC") filed a Verified Complaint for Specific Performance and Money Damages against Lear Corporation ("Lear"), and in connection with such complaint, filed a motion for a temporary restraining order. DCC alleged that Lear was refusing to ship certain interior trim parts unless DCC agreed to a major price increase. DCC refused to capitulate to Lear's demands and filed the lawsuit. Judge O'Brien entered a temporary retraining order, ruling that DCC had satisfied the four factors for injunctive relief and ordering that Lear continue to manufacture and ship the parts.

- *Delphi Auto Systems, LLC v. Center Mfg, Inc*, Case No. 04-060078-CK (Oakland County Circuit Court), Transcript attached, Exhibit 18. In August 2004, Judge Goldsmith granted a permanent injunction requiring the seller to ship the parts at issue. There, Center claimed that it could not comply with its fixed-price contracts or ship the parts at issue, because of the large increase in raw material prices. The Court, was unimpressed, and held: "The Court does have sympathy for Center's predicament because of its cost increases that it faces, but the Court believes that while that is significant on a business level, it is not significant on a legal level. These were fixed price contracts."

- *Key Safety Systems, Inc v. Proto Gage, Inc,* Case No. 2004-4173-CK (Macomb County Circuit Court, Oct 29, 2004), Exhibit 19. Judge Servitto not only issued a temporary restraining order requiring the defendant to continue to ship parts to the plaintiff, a supplier to the original equipment manufacturers, but also entered a preliminary injunction requiring shipment as well.[4]

This case is on point with Judge Steeh's recent opinion in *Key Safety Systems, Inc. v. Invista, S.A.R.L., LLC*, 2008 WL 4279358 (E.D. Mich. Sept. 16, 2008) (attached as Exhibit 21), in which he granted a Tier 1 supplier injunctive relief against a Tier II supplier, compelling the

---

[4] *See also*, *Delphi Automotive Systems, LLC v. Hayes Lemmerz Int'l, Inc*, Case No. 05-06809-CK, August 1, 2005, (Judge' O'Brien granted a TRO); *Kelsey-Hayes v. Friction Material, LLC*, Case No. 04-062347-CK, Nov 30, 2004, (Judge O'Brien granted a preliminary injunction); *TRW Automotive US, LLC v Textron Fastening Systems, Inc*, Case No. 04-056696-CK, March 8, 2004, (Judge Chabot granted a TRO); and *Meritor Heavy Vehicle Systems v. ISG Piedmont LLC*, Case No. 04-057772-CK, April 22, 2004, (Judge Chabot granted a TRO); all of which are attached as Exhibit 20 to this brief.

DYKEMA GOSSETT•A PROFESSIONAL LIMITED LIABILITY COMPANY•39577 WOODWARD AVENUE•SUITE 300•BLOOMFIELD HILLS, MICHIGAN 48304

Tier II to ship the products at issue, to avoid irreparable harm to the Tier I, to the OEMs, as well as to the workers and economies relying upon the automotive industry. In that case, Invista *S.A.R.L., LLC* ("Invista"), the Tier II supplier, sold special yarn to Key Safety Systems, Inc. ("Key Safety"), the Tier I, which was used by Key Safety to manufacture airbags for the OEMs. Invista attempted to unilaterally increase its prices for the yarn and threatened to cease supply of the same if such increased prices were not paid. Key Safety sued and sought a preliminary injunction, arguing that, pursuant to the UCC, (i) it could not "cover" by purchasing the yarn elsewhere because there were no alternative sources of supply and it would take six to nine months to identify and validate a new supplier due to the Automotive Supply System, and (ii) the concept of "covering" under the UCC did not require it accede to Invista's demands to purchase the same goods for higher prices. Judge Steeh agreed with Key Safety, ordering Invista to ship the yarn to Key Safety at the last quoted price.[5] *Id.* at *12. The Court also held that "[u]nder the UCC, specific performance is appropriate where the unique nature of the goods makes cover impossible or where a requirements contract is involved." *Id.* at *13. Notably, in balancing the factors required before entering the preliminary injunction, Judge Steeh held that there would be significant harm to others, as well as to the public interest, if the injunction was not entered,

---

[5] This instant case also is distinguishable from Judge Edmond's recent decision in *Eberspaecher North America, Inc. v. Van-Rob, Inc.*, 544 F. Supp. 2d 592 (E.D. Mich. 2008). In that case, the Tier II supplier, Van-Rob, Inc. ("Van Rob"), threatened to cease shipment of certain automotive parts (produced using the Automotive Supply System discussed above), to its Tier I customer, Eberspaecher North America, Inc. ("Eberspaecher"), unless Eberspaecher paid it increased prices for such parts. Eberspaecher objected, filing suit in Oakland County Circuit Court and obtaining a preliminary injunction compelling Van-Rob to ship. Van-Rob subsequently removed the action to federal court and filed a motion to dissolve the preliminary injunction. Judge Edmunds dissolved the injunction, principally on the basis that Eberspaecher was unable to demonstrate irreparable harm, holding that Eberspaecher could avoid the domino effect to the supply chain by paying the demanded price increases under protest, and then suing Van-Rob for damages. Here, because BAE already is paying Whitesell increased prices for the Parts under protest, what Whitesell is requiring is for BAE to relinquish its contractual rights and enter into the so-called "Supply and Requirements Contract" before it will ship the Parts to BAE. Thus, BAE has no other recourse here other than to seek an order from this Court compelling Whitesell to ship the Parts.

DYKEMA GOSSETT·A PROFESSIONAL LIMITED LIABILITY COMPANY·39577 WOODWARD AVENUE·SUITE 300·BLOOMFIELD HILLS, MICHIGAN 48304

including to the OEMs which would not receive the airbags they needed to manufacture vehicles, to the numerous plants which may be shut down and lay offs which may occur, as well as significant harm to Michigan's failing economy.  *Id*. at 13.

**C.      BAE Has A Substantial Likelihood Of Success On The Merits**

        In demonstrating the likelihood of success, "it is ordinarily sufficient if the Plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation."  *Six Clinics Holding Corp., II v. Cafcomp Systems, Inc*. 119 F.3d 393, 402 (6th Cir. 1997) (citing *In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985).  BAE has made the requisite showing here.

        **1.      The Contracts Between The Parties Are Valid Requirements Contracts**

        This case concerns whether Whitesell is obligated to deliver the Parts.  BAE has a substantial likelihood of prevailing on this threshold issue, which is all that need to be considered at this time.  Here, as is the standard in the automotive industry, the Contracts are valid and binding requirements contracts, requiring Whitesell to supply BAE with 100% of its needs for the Parts.  Specifically, Whitesell is bound by BAE's Terms and Conditions, which provide: "This Purchase Order is an offer to Seller by Purchaser (BAE industries, Inc.) to enter into a Requirements Contract as defined by the Uniform Commercial Code, as adopted in Michigan pursuant to MCLA 440.2306 et. seq., as amended…."  *See* BAE Terms and Conditions, Exhibit 4.  Under Michigan law, this language is sufficient to establish a valid requirements contract. MCL 440.2306(1) defines a requirements contract as follows:

> Output, requirements.  A term which measures the quantity by the output of the seller or the requirements of the buyer means such actual output or requirements as may occur in good faith, except that no quantity unreasonably disproportionate to any stated estimate or in the absence of a stated estimate to any normal or otherwise comparable prior output or requirements may be tendered or demanded.

DYKEMA GOSSETT•A PROFESSIONAL LIMITED LIABILITY COMPANY•39577 WOODWARD AVENUE•SUITE 300•BLOOMFIELD HILLS, MICHIGAN 48304

"No special language is necessary to create a requirements contract."  67 Am. Jur. 2d Sales § 225 (2003).

Any attempt by Whitesell to deny that it is bound by the Contracts is without merit.  Not only did Whitesell assume Technifast's obligations pursuant to the Contracts, but also it is bound by the Contracts as a result of its own actions, including by shipping the Parts to BAE pursuant to BAE purchase orders incorporating the Technifast LTA as well as the BAE Terms and Conditions (which specifically provide that performance constitutes acceptance of the terms). Additionally, Whitesell's course of performance over the past several years, wherein Whitesell has shipped the Parts pursuant to BAE's Terms and Conditions, demonstrates that the Contracts are valid, binding requirements contracts.[6]

Additionally, any argument by Whitesell that its terms and conditions are applicable (instead of BAE's Terms and Conditions) also is without merit.  As Whitesell well knows, any agreement by BAE made last summer to pay Whitesell the demanded increased prices for the Parts and to incorporate certain language on the BAE purchase orders was made under duress and under protest, and therefore BAE is not bound by the same.   Nevertheless, even if Whitesell's terms and conditions are applicable, it violated the same by failing to provide BAE with the required reasonable notice prior to terminating its shipment of the Parts.  Specifically, MCL 440.2309(3) provides:

> Termination of a contract by one party except on the happening of an agreed event requires that reasonable notification be received by the other party and an agreement dispensing with notification is

---

[6] A course of performance relates "to the conduct of the parties under the contract in question."  *Dilusso Bldg Co, Inc v. Concord Indus Group*, No. 233912, 2003 WL 462425 *2, n.1 (Mich. App., Feb 21, 2003) (unpublished), Exhibit 22.   The parties' "course of performance" is "relevant to determine the meaning of the agreement," MCL 440.2208(1), can be used to explain or supplement an agreement, MCL 440.2202(a), and is considered "highly persuasive evidence of proper contract interpretation when introduced against the party so performing….whether or not the written agreement was ambiguous."  *Dilusso*, 2003 WL 462425 *2.

DYKEMA GOSSETT•A PROFESSIONAL LIMITED LIABILITY COMPANY•39577 WOODWARD AVENUE•SUITE 300•BLOOMFIELD HILLS, MICHIGAN 48304

invalid if its operation would be unconscionable. *See* MCL 440.2390(3).

Further, the length of any notice of termination must be sufficient to provide the buyer enough time to secure alternative supplies.  Indeed, the comments to MCL 44.2309 recognize this, and provide:

> 8. Subsection (3) recognizes that the application of principles of good faith and sound commercial practice **normally call for such notification of the termination of a going contract relationship as will give the other party reasonable time to seek a substitute arrangement.** An agreement dispensing with notification or limiting the time for the seeking of a substitute arrangement is, of course, valid under this subsection unless the results of putting it into operation would be the creation of an unconscionable state of affairs.

Case law is in accord.  *See Aaron E. Levine and Company, Inc. v. Calkraft Paper Company*, 429 F. Supp. 1039, 1050 (E.D. Mich. 1976) (Under Michigan law, "[t]he consideration to what constitutes sufficient or reasonable notice of termination depends upon the circumstances of the particular case.  However, the cases seem to hinge closely upon the amount of time necessary to enable the distributor to look for a new source of supply."); *Paw Paw Wine Distributors, Inc. v. Joseph E. Seagram & Sons, Inc.*, 34 F. Supp.2d 550, 556 (W.D. Mich. 1988) (under Michigan law, after notice of termination, "plaintiffs are entitled to such time as is necessary to minimize their losses by making other arrangements" for supply of the goods).  Here, because it will take BAE three to six months to identify and validate new suppliers to manufacture the Parts, reasonable notice necessarily must be at least that long.  Accordingly, Whitesell's attempt to terminate its supply of the Parts with only thirty days notice is not permissible.

## 2.    Whitesell's Further Presumed Arguments Are Without Merit

To the extent Whitesell seeks to avoid the plain language of the Contracts and its actions accepting the terms of the same, Whitesell's arguments will likely be very similar to Webco's

DYKEMA GOSSETT•A PROFESSIONAL LIMITED LIABILITY COMPANY•39577 WOODWARD AVENUE•SUITE 300•BLOOMFIELD HILLS, MICHIGAN 48304

position in *Chainworks, Inc v. Webco Industries, Inc***,** No. 1:05-CV-135, 2006 WL 461251 (WD Mich, Feb 24, 2006).  *See* Exhibit 23.  In *Chainworks*, the parties had fixed price requirements contracts whereby Webco was obligated to supply to Chainworks all of its steel requirements. When the price of steel increased, and the contracts were no longer profitable, Webco demanded new contract terms (there, increased prices).  When Chainworks sued Webco, Webco devised what the court referred to as "numerous creative arguments" to extricate itself from the contract. The Court expressly rejected a "battle-of-the-forms" argument, holding instead that Chainworks' purchase order was the offer and that it was accepted by Webco.  The court recognized that Webco was simply trying to avoid what it considered an unprofitable deal, providing: "**[A] deal is a deal.**  That is, the parties agreed to a contract that would provide Chainworks with all the steel tubing it required at a fixed price.  When Webco sought to increase that price, it breached the contract."  *See* Exhibit 23.

Whitesell likewise needs to understand that a "deal is a deal."  The crux of this issue here, just as it was in *Chainworks* and a myriad of other supplier disputes that have come before courts in Michigan recently, is that Whitesell's arrangement is allegedly no longer preferable or profitable to it.  But this does not excuse its performance.  In sum, Whitesell breached the Contracts when it threatened to cease delivery of the Parts unless BAE agreed to Whitesell's unilateral and baseless demands.  Whitesell will now likely devise a variety of specious arguments to avoid its deal; however, just as the court in *Chainworks* ruled that a "deal is a deal," this Court too should hold Whitesell to the terms of the Contracts.

**D.**     **A Preliminary Injunction Is In The Public Interest**

The final factor to be considered is the public interest.  Here, public interest clearly would be best served by requiring Whitesell to comply with the Contracts pending the resolution of the parties' dispute or until a new supplier or suppliers can begin shipping 100% of the Parts to

BAE's suppliers.  Not only will a continued cessation of shipment affect BAE, but it will adversely affect its employees, its Tier I customers, the OEMs, and other suppliers, and their employees, automobile dealers, and ultimately consumers.  Whitesell on the other hand, is utilizing the industry standards of the "just in time, single source" supply systems as leverage to obtain significant concessions from BAE to which it is not entitled.  Public policy strongly discourages such economic extortion.  There is a stark difference between the far-reaching consequences to BAE and the degree of financial and other harm it faces versus Whitesell's position, which is to merely extract as many concessions as possible from BAE.

## IV.   CONCLUSION

BAE respectfully requests that the Court grant this motion and enter the TRO and Order Setting Hearing on Preliminary Injunction, submitted to this Court electronically.

Respectfully submitted,

DYKEMA GOSSETT PLLC

By: **s/Marilyn A. Peters**
Marilyn A. Peters (P32095)
Dykema Gossett PLLC
Attorneys for BAE Industries, Inc.
39577 Woodward Avenue, Suite 300
Bloomfield Hills, MI 48304
(248) 203-0768
mpeters@dykema.com

Date: October 22, 2008

BH01\917276.1
ID\WJH