**UNITED STATES DISTRICT COURT**
**IN THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

BAE INDUSTRIES, INC. a Michigan
corporation,

               Plaintiff,                    Case No. 2:08-cv-14497-AC-DAS

vs.                                    Hon. Avern Cohn

WHITESELL CORPORATION, an Alabama
Corporation, and WHITESELL
INTERNATIONAL CORPORATION, an
Alabama Corporation,

               Defendants.

_____/

| | |
|---|---|
| Marilyn A. Peters (P32095) | Philip J. Kessler (P15921) |
| Laura C. Baucus (P56932) | Daniel J. Dulworth (P41784) |
| William J. Hallan (P70993) | Timothy J. Lowe (P68669) |
| Dykema Gossett PLLC | Butzel Long |
| Attorneys for BAE Industries, Inc. | Attorneys for Whitesell Corporation and |
| 39577 Woodward Avenue, Ste. 300 | Whitesell International Corporation |
| Bloomfield Hills, MI 48304 | 150 West Jefferson Avenue, Ste. 100 |
| (248) 203-0768/ 203-0796 | Detroit, MI  48226 |
| mpeters@dykema.com | (313) 225-7000 |
| lbaucus@dykema.com | kessler@butzel.com |
| whallan@dykema.com | dulworth@butzel.com |
| | lowe@butzel.com |

_____/

**DEFENDANTS' RESPONSE TO BAE INDUSTRIES INC'S**
**MOTION FOR TEMPORARY RESTRAINING ORDER**
**AND PRELIMINARY INJUNCTION**

**COUNTER-STATEMENT OF QUESTION PRESENTED**

     Whether the Court should DENY BAE's Motion for a Temporary Restraining Order and

Preliminary Injunction where: (1) the June 18, 2008 negotiated contract between the parties

provides for termination of their contract at Whitesell's convenience upon notice to BAE;  (2)

after Whitesell attempted to negotiate a long-term supply contract with BAE this past summer,

BAE refused and began resourcing the Parts to a new supplier; (3) *after* BAE refused to negotiate a long-term contract and began resourcing the Parts to a new supplier, Whitesell gave BAE 30 days notice of termination on September 23, 2008; (4) in response to Whitesell's termination notice, BAE stated both that it would "move" Whitesell's business and that it would send a "marked-up" draft of the proposed supply agreement (which it never did); (5) in response to Whitesell's termination notice, BAE never told Whitesell that it needed more time to resource the parts until less than 48-hours before the termination was effective and after Whitesell had begun winding down production of Parts for BAE; (6) Whitesell has not breached its June 18, 2008 contract with BAE and did not breach its previous contract, which was embodied in an August 2006 quotation to BAE and the accompanying Whitesell terms and conditions; (7) BAE's alleged harm is purely economic and can be remedied by monetary damages; and (8) Whitesell will be harmed if an injunction is issued because it will have to resume production of the Parts?

| | |
|---|---|
| Whitesell says: | Yes |
| BAE says: | No |

## INTRODUCTION

Despite the efforts of BAE Industries, Inc. ("BAE") to convince the Court that BAE and Defendants Whitesell Corporation and Whitesell International Corporation (together, "Whitesell") were parties to a long-term requirements contract which Whitesell breached, there is no question of fact that the only contract by which the parties were bound, and which Whitesell appropriately terminated, was Purchase Order No. 34873 issued by BAE June 18, 2008.[1]   That contract – negotiated at arms length by the parties – explicitly incorporated

---

[1] *See* BAE's Brief in Support of its Motion for Temporary Restraining Order and Preliminary Injunction, Exhibit 10 (the exhibits to BAE's Brief shall be referenced to as "BAE Brief, Ex. __").

Whitesell's Terms and Conditions (which permitted Whitesell to terminate for convenience) (BAE Brief, Ex. 5) and was not a requirements contract because it contained no quantity term or any "requirements" language.

Following the issuance of Purchase Order No. 34873 in June 2008, the parties discussed entering into a long-term supply agreement. By late summer, Whitesell heard that BAE was working to resource the business and Whitesell informed BAE that it was not prepared to carry on with the relationship absent a long-term agreement. BAE chose not to enter into a long-term agreement. Because BAE refused to enter into a long-term agreement, Whitesell exercised its right to terminate Purchase Order No. 34873 under its Terms and Conditions, and provided notice to BAE September 23, 2008, informing BAE that if BAE "desired," Whitesell would continue to supply BAE's production requirements for another 30 days, ending October 23, 2008.[2] BAE Brief, Ex. 12. BAE never objected to this notice by telling Whitesell that 30 days was not sufficient time for it to resource the parts (indeed, BAE informed Steve Naseef of Whitesell that BAE could resource Whitesell's Parts "at any time") and instead sent Whitesell releases for additional product. Hearing no objection whatsoever, and assuming the 30-day supply was thus acceptable to BAE, Whitesell began winding down the production of parts for BAE. But, at the close of business on October 21, less than 48 hours before expiration of the notice period, BAE's attorneys sent a letter to Whitesell announcing for the first time that BAE objected to "only 30 days notice" and stating that it needed parts "at least through December 31, 2008." BAE Brief, Ex. 14.

Notwithstanding this late "objection," Whitesell complied with the terms of the parties' contract in exercising its right to terminate for convenience and in giving notice as required under the contract. The notice was sufficient, given that BAE had begun resourcing production

of the Parts before Whitesell gave the notice, and BAE waived any right to object to the duration of the notice by failing to do so in a timely manner, especially since Whitesell relied upon BAE's silence.  BAE's motion for injunctive relief, therefore, should be denied.

## STATEMENT OF FACTS

**A.     The Parties.**

Whitesell is the manufacturer of, among other things, fastening systems (the "Parts") for the automotive industry.   BAE is a customer of Whitesell that uses the Parts it buys from Whitesell to produce parts for various automotive platforms.

**B.     The Present Dispute**

Whitesell began supplying the Parts to BAE in August 2006 after Whitesell acquired certain assets of Technifast Industries, Inc. ("TFI").   Importantly, since this was only an asset and not a stock deal, Whitesell did not assume all of the rights and obligations of TFI, but only certain disclosed and assumed contracts as listed on schedules to the Asset Purchase Agreement with TFI.  *See attached* **Exhibit A**; **Exhibit B**.  TFI had supplied Parts to BAE since 2000 pursuant to purchase orders and releases issued by BAE and it was the production equipment and right to produce these parts for BAE that Whitesell purchased from TFI – Whitesell did not acquire the purchase order contracts between BAE and TFI.[3]  *Id.*

After purchasing certain assets from TFI in August 2006, Whitesell notified BAE of the purchase, and further stated that it would continue to supply the Parts per the Whitesell quotation attached to its letter.  **Exhibit C**.  That quotation included price terms, quantities, shipping terms,

---

[2] Note that Whitesell did not make any demands for price increases; it simply desired a long-term supply agreement.
[3] BAE asserts that it entered into a long term agreement with TFI.  BAE Brief, Ex. 1.  But the "agreement" to which it refers is merely a "proposal" to enter a long term agreement, *see id.* at p. 1, and was not a binding contract on TFI because it was never signed by TFI or BAE, and contained no product descriptions, quantities or price.  In any event, even if it was a binding contract on TFI, Whitesell did not acquire the contract as part of its asset purchase from TFI.

and payment terms.  *Id.*  The quotation also incorporated Whitesell's then applicable terms and conditions which provided, among other things, that BAE would pay any charges related to "unanticipated increases in manufacturing costs including, without limitation, increased in costs of material. . . ."  *Id.* at 5, ¶ 3.   Additionally, Whitesell was permitted to "terminate all or any part of [the] contract, at any time and for any reason, by giving written notice to Buyer.*"  *Id.* at 5, ¶ 11.   BAE never objected to this quotation and accepted it by issuing purchase orders in response to it; Whitesell shipped, and BAE accepted, Parts pursuant to that quotation.

Following the recent unprecedented rise in the price of steel and fuel, Whitesell notified its customers of the need for price adjustments in May 2008.  On May 29, 2008, Whitesell's Matt Johannessen wrote BAE to notify it of the price increase, and simultaneously provided it with a revised quotation along with Whitesell's "General Terms and Conditions of Whitesell as Seller of Products/Services" (the "WS T/C's").   BAE Brief, Ex. 5.   This quotation was expressly effective 10 days from May 29, 2008.  BAE initially ignored Whitesell's need for price relief, breaching its obligations under the terms of the August 2006 quotation and terms and conditions. *Id.* at 5, ¶ 3.  Pursuant to the August 2006 quotation and terms and conditions, Whitesell was permitted to terminate for convenience. *Id.* at 5, ¶ 11.   BAE eventually agreed to the price increase, but attempted to do so under protest by issuing a new purchase order on June 17, 2008 that purported to reserve BAE's rights to protest the price increase and apply BAE's terms and conditions.  BAE Brief, Ex. 8.

Whitesell responded to BAE's proposed purchase order in a letter dated June 18, 2008, informing BAE that Whitesell would not do business by accepting orders which were placed "under protest" and pursuant to actual or implied threats of legal action by BAE.  BAE Brief, Ex. 9.  Whitesell informed BAE that it was happy to continue its business relationship with BAE as

long as BAE agreed to the price increases and issued a purchase order which accepted and incorporated, among other things, the WS T/C's; Whitesell also invited BAE to enter into negotiations for a long-term contract. *Id.*

Instead of taking legal or other action, BAE responded to Whitesell's June 18, 2008 correspondence the same day by issuing a new purchase order, expressly accepting the WS T/C's and the terms of the May 29, 2008 letter, without any reservation [Purchase Order No. 34873 (BAE Brief, Ex. 10)].  Among other terms, the WS T/C's provide:

> 1.    OFFER AND ACCEPTANCE: These terms and conditions govern all sales of product and services to Buyer.  Buyer has read, understands, accepts and agrees to these terms and conditions.  Seller rejects, and objects to, all terms and conditions of Buyer, and hereby notifies Buyer that Seller considers any term or condition of Buyer an unacceptable material alteration of these terms and conditions. . . . By signing the Offer or by purchasing and accepting product or services pursuant to the Offer, Buyer agrees that (i) the Offer shall be construed as an offer or counteroffer by Seller, and not as an acceptance by Seller of any offer by Buyer or any prior, additional of different terms proposed by Buyer; and (ii) acceptance of the Offer by Buyer is expressly limited to acceptance of only the terms and conditions stated in the Offer, and upon acceptance the Offer shall constitute the entire contract between the parties. . . .
>
> *    *    *
>
> 10.    TERMINATION:  Seller may, without any liability of Seller to Buyer, terminate all or any part of this contract, suspend shipment of product, and seek all remedies to which Seller is entitled . . . .  Without limiting the foregoing, Seller may also, without any liability of Seller to Buyer, terminate this contract for convenience, as to product not yet shipped or orders not yet placed, upon notice of such termination to Buyer.

BAE Brief, Ex. 5.  The parties have conducted business pursuant to the May 29, 2008 quotation and Purchase Order No. 34873 since June 18, 2008.

In accordance with its June 18, 2008 letter, Whitesell invited BAE to discuss entering into a long-term supply contract.  In August 2008, Whitesell sent BAE a draft Supply and Requirements Agreement.  BAE Brief, Ex. 11.  At about the same time, Whitesell heard that

BAE was working to resource the business; BAE had informed Whitesell on various occasions that it could resource the business "at any time."   **Exhibit D, Affidavit of Steven Semmler.** Whitesell informed BAE that it was not prepared to carry on with the relationship absent a long-term agreement.   BAE, however, refused to enter into a long-term agreement; therefore, on September 23, 2008, Whitesell notified BAE that, because of the parties' strained relationship due to, among other things, BAE's payment defaults, Whitesell was discontinuing the parties' relationship effective October 23, 2008.   BAE Brief, Ex. 12.   Whitesell did offer to continue supplying Parts for 30 days if preferred by BAE:

> If desired by BAE, and so long as BAE meets its payment and other obligations to Whitesell, we are prepared to supply your production requirements as it relates to our current available inventory for up to 30 days ending October 23, 2008.

*Id.*

While BAE did contact Whitesell following receipt of this notice and initially indicated it was interested in discussing a long-term supply agreement and that it would send a marked-up draft of the proposed agreement which Whitesell had sent it in August, BAE ultimately sent nothing.   **Exhibit D, Affidavit of Steven Semmler.**   Additionally, BAE never informed Whitesell that 30 days was not sufficient time to allow it to resource the Parts; instead BAE simply sent Whitesell releases for additional product.  Because BAE refused to enter into a long-term supply agreement and had already begun looking for a new supplier – and not receiving any objection to the termination notice – Whitesell began winding down and ceasing production of Parts for BAE.  While Whitesell wound down its operations for BAE, it did continue supplying product to BAE from September 23, 2008 to the present time.[4]

---

[4] On October 24, 2008, Whitesell agreed to temporarily continue supply of Parts to BAE while the parties attempted to negotiate a resolution to this lawsuit.

At the close of business on October 21, less than 48 hours before expiration of the notice period, BAE's attorneys sent a letter to Whitesell announcing for the first time that BAE objected to "only 30 days notice" and stating that it needed parts "at least through December 31, 2008."[5] BAE Brief, Ex. 14.  Notwithstanding this late "objection," Whitesell complied with the terms of the parties' contract in exercising its right to terminate for convenience and in giving notice as required under the contract.  The notice was sufficient, and BAE waived any right to object to the duration of the notice by failing to do so in a timely manner, especially since Whitesell relied upon BAE's silence and began to wind down its manufacturing facility.

## ARGUMENT

### A.      Standard for Injunctive Relief.

The following four factors should be considered in determining whether to grant a preliminary injunction:

> (1)      The likelihood that the party seeking the injunction will prevail on the merits;
>
> (2)      The danger that the party seeking the injunction will suffer irreparable injury if the injunction is not issued;
>
> (3)      The risk that the party seeking the injunction would be harmed more by the absence of an injunction than the opposing party would be by the granting of the relief; and
>
> (4)      The harm to the public interest if the injunction is issued.

*Sandison v. Michigan High School Athletic Ass'n*, 64 F.3d 1026 (6th Cir. 1995).  The decision to grant or deny preliminary injunctive relief should be based on the facts of the particular case in question.  *Id.*

---

[5]  In the most recent releases sent by BAE to Whitesell, BAE has removed shipments of all but two Parts after December 1, 2008.  Previously, BAE's releases had covered shipments of all of the Parts through December 31, 2008.  **Exhibit D, Affidavit of Steven Semmler, ¶ 30.**

8

Injunctive relief is "only issued in the most compelling cases." *Thompson v. Chrysler Corp.,* 382 F. Supp. 1317, 1319 (E. D. Mich. 1974), *aff'd* 569 F.2d 989 (6th Cir. 1978). It is well established that "[t]his type of relief is an extraordinary remedy best used sparingly." *Schalk v. Teledyne, Inc*, 751 F. Supp. 1261, 1263 (W. D. Mich. 1990), *aff'd* 948 F.2d, 1290 (6th Cir. 1991). "There is no power the exercise of which requires greater caution, deliberation and sound discretion, or more dangerous in a doubtful case, than the issuing of an injunction . . . ." *Roghan v. Block*, 590 F. Supp. 150, 153 (W. D. Mich. 1984), *aff'd* 790 F.2d 540 (*quoting Detroit Newspaper Publishers Ass'n v. Detroit Typographical Union*, 471 F.2d 872, 876 (6th Cir. 1972)). "A preliminary injunction, like all injunctions, is an equitable remedy which courts refuse to grant unless the right to relief is clear." *Merrill Lynch, Pierce, Fenner & Smith, Inc v. Grall*, 836 F. Supp. 428, 431 (W. D. Mich. 1993).

Balancing the four factors required for a preliminary injunction, BAE cannot establish the requirements for preliminary injunctive relief.

**B.    BAE Will Not Succeed On The Merits of its Claims.**

Plaintiff must demonstrate more than a mere "possibility" of success on the merits to warrant the issuance of a preliminary injunction because such a standard would render the test for a preliminary injunction virtually meaningless. *Ohio v. Nuclear Regulatory Commission*, 812 F.2d 288, 290 (6th Cir. 1987); *In re DeLorean Motor Co.,* 755 F.2d 1223, 1228-29 (6th Cir. 1985) (*citing SEC v. Senex Corp.*, 534 F.2d 1240, 1241 (6th Cir. 1970)). The Sixth Circuit requires that a movant sufficiently demonstrate a "strong or substantial likelihood or probability of success." *Jerome Duncan, Inc v. Auto-By-Tel, LLC,* 966 F. Supp. 540, 541 (E. D. Mich. 1997) (*citing United of Omaha Life Ins Co v. Solomon*, 960 F.2d 31, 35 (6th Cir. 1992)). BAE has

failed to establish even the possibility of success, let alone a strong or substantial likelihood as required by the Sixth Circuit.

BAE argues that Whitesell has breached its contract with BAE, relying on the "Proposal for Long Term Agreement ("LTA")" (BAE Brief, Ex. 2) and BAE's terms and conditions. BAE's claim is fatally flawed because the LTA was a never a binding contact (it was never signed by TFI contained no quantity term), nor was it ever assumed by Whitesell.  In fact, after Whitesell acquired the TFI assets, it sent a quotation to BAE in August 2006 which incorporated Whitesell's then applicable terms and conditions and notified BAE that it would continue to supply Parts to BAE, but only pursuant to Whitesell's quotation; thus, to the extent there was an enforceable contract between the parties in existence prior to June 2008, Whitesell's Terms and Conditions expressly governed such contract (which required BAE to pay any unanticipated price increases and allowed Whitesell to terminate at any time).  And, to the extent there was an enforceable contract between the parties in existence prior to June 2008, such contract was terminated by the parties on June 18, 2008 when BAE issued a new purchase order incorporating Whitesell's May 29, 2008 quote and the WS T/C's.  Further, Whitesell has not breached any contract.  Since Whitesell has not breached any contract, BAE's motion should be denied.

### 1.     *The June 18, 2008 Purchase Order is the Only Enforceable Contract.*

BAE argues that Whitesell assumed the TFI contract with BAE when Whitesell purchased certain assets from TFI in 2006, and that BAE and Whitesell later entered into "new" contracts in 2006 when BAE began sending new purchase orders to Whitesell with Whitesell's name on them.  As discussed below, BAE's arguments are incorrect.  But irrespective of the contractual relationship in existence prior to June 2008, when BAE issued Purchase Order No. 34873 on June 18, 2008 (BAE Brief, Ex. 10), this became the governing contract between the

parties.  This contract also expressly incorporated Whitesell's May 29, 2008 quotation and the accompanying WS T/C's, which permitted Whitesell to terminate for convenience.  BAE Brief, Ex. 5.

Purchase Order No. 34873 was negotiated at arms length by the parties in June 2008 and accepted, without reservation, by BAE on June 18, 2008.  BAE agreed to accept the quotation and the WS T/C's as is and not under protest.  Whitesell and BAE have conducted business pursuant to Purchase Order No. 34873 ever since.

**2.     *The June 18, 2008 Purchase Order Was Not Made Under Duress or Protest.***

The June 18, 2008 purchase order issued by BAE was not made under protest or duress. The purchase order contains no language suggesting it was made under protest or any reservation of rights.  While BAE initially issued a purchase order attempting to reserve its rights (BAE Brief, Ex. 8), Whitesell refused to enter into such a contract, informing BAE that Whitesell would not do business by accepting orders which were placed "under protest" and pursuant to actual or implied threats of legal action by BAE.  BAE Brief, Ex. 9.  Whitesell advised BAE that it would continue its business relationship with BAE as long as BAE agreed to the price increases and issued a purchase order which accepted and incorporated, among other things, the WS T/C's.  *Id.*  Instead of taking legal or other action, BAE responded to Whitesell's June 18, 2008 correspondence the same day by issuing a new purchase order, expressly accepting the WS T/C's and the terms of the May 29, 2008 letter, without any reservation [Purchase Order No. 34873 (BAE Brief, Ex. 10)].  Purchase Order No. 34873 provides:

> BAE is accepting the current pricing, terms, and conditions reflected in Whitesell's most recent Quotation, dated 05/29/2008, for the goods covered by this order.

BAE Brief, Ex. 10.

Even though BAE voluntarily issued the new Purchase Order containing no reservation of rights, it now complains to this Court that it issued the Purchase Order under protest. But because BAE failed to explicitly reserve its rights in issuing, and then performing under, the new Purchase Order, it has waived any right to contest the validity of the contract which it issued. MCL § 440.1207(1) provides:

> A party who with explicit reservation of rights performs or promises performance or assents to performance in a manner demanded or offered by the other party does not thereby prejudice the rights reserved. Such words as "without prejudice," "under protest" or the like are sufficient.

Again, the most recent BAE Purchase Order does not contain such language and the failure to explicitly reserve rights has been found to waive those rights. *See Mid-South Packers, Inc. v. Shoney's, Inc.*, 761 F.2d 1117, 1122 (5th Cir. 1985); *see also Bivins v. White Dairy*, 378 So. 2d 1122 (Ala. 1979).

To the extent BAE argues that the June 18, 2008 purchase order was made under duress, and therefore a previous purchase order controls, that argument also fails.

> [T]o succeed with respect to a claim of duress, [defendants] must establish that they were illegally compelled or coerced to act by fear of serious injury to their persons, reputations, or fortunes. 'Fear of financial ruin alone is insufficient to establish economic duress; it must also be established that the person applying the coercion acted unlawfully.'

*Farm Credit Servs., P.C.A. v. Weldon*, 232 Mich. App. 662, 682 (1998) (quoting *Enzymes of Am. v. Deloitte*, 207 Mich. App. 28, 35 (1994)). "In order to void a contract on the basis of economic duress, the wrongful act or threat must deprive the victim of his unfettered will. Further, the party threatened must not have an adequate legal remedy available." *Hungerman v. McCord Gasket Corp.*, 189 Mich. App. 675, 677 (1991) (finding no duress where plaintiff signed release after threat that his accrued vacation pay would be withheld). BAE could have chosen not to issue a purchase that accepted Whitesell's quotation and the WS T/C's and taken legal action,

but it voluntarily made the decision to issue the new Purchase Order and not to pursue its "rights." BAE's fear of financial loss is not sufficient to show duress. Whitesell acted within its rights to request a purchase order that accepted its quotation and the WS T/C's, and BAE agreed. BAE's duress argument therefore fails.

### 3.       The LTA Was Not A Binding Contract.

BAE argues that it entered into a long term supply contract with TFI, which Whitesell assumed when Whitesell purchased certain assets from TFI in 2006. As explained above, even if it did, the parties negotiated a new contract in June 2008, and all previous contracts, if any, were terminated. But BAE's analysis regarding a long term supply contract is flawed in any event.

The "LTA" relied upon by BAE (BAE Brief, Ex. 2) was merely a "proposal" for a supply relationship between TFI and BAE, but it was never an actual contract between the parties. The document provides at the outset that it is a "Proposal for a Long Term Agreement" and an "instrument of understanding." *Id.* Moreover, it was never signed by TFI. The UCC is clear that a contract for the sale of goods is not valid unless it is signed by the party to be charged and contains a quantity provision:

> Except as otherwise provided in this section, a contract for the sale of goods for the price of $1,000.00 or more is not enforceable by way of action or defense unless there is a writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his or her authorized agent or broker. Writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this subsection beyond the quantity of goods shown in the writing.

MCL § 440.2201(1); see *also West Cent. Packing, Inc. v. A. F. Murch Co*., 109 Mich. App. 493 (1981).[6]

---

[6] Whitesell takes no position at this time on what state's law may apply to this dispute. It reserves it right, however, to argue that Alabama law may apply based on the application of the WS T/C's.

The LTA is an unsigned proposal, and contains no quantity of goods. As such, it was not binding on TFI, and could not be binding on Whitesell (even had Whitesell assumed liability for the TFI contract when it purchased TFI's assets). BAE's claim of breach of the LTA is not likely to succeed because the LTA was not a valid contract.

### 4.      *Whitesell Did Not Assume The Contract.*

Furthermore, Whitesell never assumed whatever contract there was between TFI and BAE, as evidenced in the LTA or otherwise. In purchasing certain assets of TFI, Whitesell did not assume all of TFI's liabilities. Even if the LTA was a binding contract between BAE and TFI, that putative contract was not among those which Whitesell assumed when it purchase the operating assets of TFI. **Exhibit A**; **Exhibit B**. Instead, Whitesell offered to continue to supply the Parts to BAE pursuant Whitesell's August 2006 quotation and terms and conditions. Whitesell is not, and never has been, bound by the LTA or any other contract between TFI and BAE because it did not assume those contracts in the asset sale. Because Whitesell assumed none of the contracts between TFI and BAE, BAE's claim that Whitesell breached those contracts is not likely to succeed.

### 5.      *Whitesell Is Not Bound By BAE's Terms and Conditions.*

Whitesell did not enter into a contract with BAE based on BAE's terms and conditions. As an initial matter, it is clear from Whitesell's August 2006 quotation and the accompanying terms and conditions that any contract between the parties would be based on that quotation and those terms and conditions, and not BAE's terms and conditions. Moreover, even though BAE's purchase order purports to bind Whitesell to BAE's terms and conditions, those terms and conditions were never transmitted to Whitesell and Whitesell was not otherwise given access to them. **Exhibit D, Affidavit of Steven Semmler,** ¶ 10. The terms and conditions were available

via BAE's website, but the website is password protected and BAE never provided Whitesell with the password. *Id.* Whitesell cannot be bound to terms and conditions it never received, and any claim by BAE that its terms and conditions form a contract thus fails.

       **6.**       ***Whitesell Has Not Breached Its Contract With BAE.***

The only binding contract on the parties is Purchase Order No. 34873 issued by BAE June 18, 2008. Whitesell terminated that contract for convenience on September 23, 2008, giving BAE 30 days notice. BAE initially responded by stating that it was now interested in discussing a supply agreement, and stated that it would send a marked-up draft of the proposed supply agreement that Whitesell sent BAE in August – however, BAE never sent the draft or otherwise attempted to negotiate. **Exhibit D**, **Affidavit of Steven Semmler.** More importantly, BAE did not object by informing Whitesell that it needed more time to resource. *Id.* Instead, BAE continued to issue releases for Parts causing Whitesell to assume that BAE accepted the termination and that the relationship would end October 23, 2008. Whitesell believed that 30 days was reasonable notice of termination, considering that BAE had already begun resourcing the Parts, several of the Parts are generic in nature and replacement suppliers can quickly and easily be retained, and that BAE had informed Whitesell on a few occasions that it could resource Whitesell "at any time." **Exhibit D, Affidavit of Steven Semmler, ¶ 18**, **21-22**.

After BAE refused to enter into a long-term agreement and began resourcing the Parts, and relying upon BAE's silence in response to the notice of termination, Whitesell began winding down and ceasing production of Parts for BAE. Although Whitesell wound down its operations for BAE, it continued supplying product to BAE from September 23, 2008 to the present time. **Exhibit D, Affidavit of Steven Semmler, ¶ 23-24**.

Rather than inform Whitesell that 30 days was not sufficient time to allow it to resource, or even file a lawsuit, BAE sat on its rights, leaving Whitesell to draw only one conclusion: BAE accepted Whitesell's 30-day supply offer and expected the relationship to end on October 23, 2008. Not until Whitesell was contacted by BAE's counsel at the close of business on October 21, 2008, less than 48 hours prior to expiration of the notice period, did Whitesell receive any indication otherwise. This was, of course, weeks after Whitesell had begun taking steps to shut down production of the Parts. By sitting on its rights in this fashion, BAE's claim for equitable relief in the form of an injunction should be denied under the doctrine of laches.

Under Michigan law, "the application of the doctrine of laches requires the passage of time combined with a change in condition that would make it inequitable to enforce the claim against the defendant." *Gallagher v. Keefe*, 232 Mich. App. 363, 369 (1998) (citing *City of Troy v. Papadelis*, 226 Mich. App. 90, 96–97 (1997)). Thus, there are two elements that must be established in order to enforce laches: 1) an inexcusable delay in bringing suit on behalf of the plaintiff; and 2) prejudice or harm inflicted upon the defendant. "It is the effect, rather than the fact, of the passage of time that may trigger the defense of laches." *Papadelis, 226 Mich. App. at 96* (quoting *Great Lakes Gas Transmission Co v MacDonald*, 193 Mich App 571 (1992)).

Here, there is no justification for BAE's delay in responding to Whitesell's termination notice until less than two days before the termination took place. This pattern of delay has been a hallmark of BAE's actions toward Whitesell. It is Whitesell who wanted to continue doing business with and supplying Parts to BAE under a long-term supply agreement, but it is BAE who no longer wanted to buy Whitesell's Parts and began resourcing the parts in the summer. When Whitesell did not hear from BAE after it sent the termination notice on September 23, 2008, it fairly assumed that BAE agreed with the 30 day termination notice and took steps to end

16

production.  BAE's inexcusable delay in objecting at this late date will prejudice and cause harm to Whitesell if Whitesell is ordered to resume production of the Parts, because Whitesell will have to expend time and money to ramp back up and resume manufacturing for a brief period of time which BAE now desires while it moves its business to a new supplier.

Whitesell has not breached the contract between the parties, and BAE's breach of contract claim will not succeed.

## C.    BAE Will Not Suffer Irreparable Harm.

While a movant must make a strong showing on all four factors to justify the issuance of an injunction, irreparable injury is the single most important prerequisite the Court must examine when ruling upon a motion for injunctive relief.  "The absence of irreparable injury must end the Court's inquiry."  *Paw Paw Wine Distributors* v. *Seagram,* 603 F. Supp. 398 (W. D. Mich. 1985); *Paradise Distributors v. Evansville Brewing Co.,* 906 F. Supp. 619, 622 (N. D. Ok1. 1995); *Neveux v Webcraft Technologies*, 921 F Supp 1568, 1571 (E. D. Mich. 1996) ("a plaintiff must *always* demonstrate some irreparable injury before a preliminary injunction may issue."). Plaintiff's failure to establish that damages are inadequate negates the need to consider other factors.  *Paw Paw Wine Distributors,* 603 F. Supp. at 398.

The courts in this circuit have consistently held that economic loss does not constitute irreparable harm.  *Nagel v. Thomas*, 666 F Supp 1002 (W. D. Mich. 1987) (holding that 'immediate financial loss by itself does not constitute irreparable harm.'); *Teamsters Local Union 299 v US Truck Co Holdings Inc, et al*, 87 F. Supp.2d 726 (E. D. Mich. 2000) (requiring plaintiffs to show more than mere financial hardships).  In fact, alleged irreparable harm that is purely financial is "a factor entitled to less weight under the Sixth Circuit balancing test."

*Charter Township of Van Buren v Adamkus*, 965 F Supp 959, 970 (E. D. Mich. 1997) (citations omitted).

The concept of irreparable injury turns upon the inadequacy of compensatory damages. "Irreparable injury is an injury for which monetary award cannot be adequately compensated." *Merrill Lynch, P.F. & S. Inc. v. E.F. Hutton & Co., Inc.*, 403 F. Supp. 336, 343 (E.D. Mich. 1975); *Paradise Distributors v. Evansville Brewing Co.,* 906 F. Supp. 619, 622 (N. D. Ok1. 1995). The moving party "must demonstrate a noncompensable injury for which there is no legal measure of damages, or none that can be determined with a sufficient degree of certainty." *Merrill Lynch,* 403 F. Supp. at 343. "If the injury complained of may be compensated by an award of monetary damages, then an adequate remedy at law exists and *no irreparable harm may be found as a matter of law.*" *Paradise Distributors v. Evansville Brewing Co.,* 906 F. Supp. 619, 622 (N. D. Ok1. 1995) (emphasis added).

Here, BAE's injury will be purely economic. It must seek an alternative supplier and presumably started the resourcing process weeks ago. Based on its experience producing the Parts, and based on BAE's representations that it could resource Whitesell "at any time," it is Whitesell's belief that BAE should have been already able to contract with a new supplier. If it has yet to start purchasing parts from a new supplier, it is likely very close to doing so and any costs it must expend due to possible late shipments to Tier 1 suppliers or OEMs can be remedied with money damages. Furthermore, and perhaps most importantly, BAE has provided no evidence, beyond its own Verified Complaint, that any Tier 1 suppliers or OEM's will in fact be shut down if Whitesell is permitted to terminate the Purchase Order.

BAE simply does not like the contract it agreed to in June 2008. It knew then, and definitely knew in August 2008, that it was not satisfied with its relationship with Whitesell and

no longer wished to purchase Parts from Whitesell.  BAE began finding a new parts supplier and refused to negotiate a long-term contract with Whitesell.  Whitesell then exercised its right to terminate the parties' relationship for convenience and provided BAE 30 days notice – a sufficient time to find an alternate supplier of the Parts.  BAE has not demonstrated that it will suffer irreparable harm if injunctive relief is denied.

**D.    BAE Will Not Be Harmed If No Injunction Is Issued.**

As explained above, BAE's potential harm can be remedied with monetary damages. Accordingly, BAE does not need an injunction, and will not be disproportionately harmed if an injunction is not issued.  Whitesell, on the other hand, will be harmed if an injunction is issued because it will have to incur costs in resuming production of the Parts.

**E.    There Will Be No Harm to the Public Interest.**

The public interest will not be served by an injunction that re-writes the parties' contract. BAE expressly agreed to be bound by the WS T/C's which provide that Whitesell may terminate the contract for convenience with notice to BAE.  Whitesell provided such notice, and the Court is respectfully urged to respect the parties' right to contract, which permitted Whitesell to terminate for convenience upon notice to BAE.

## CONCLUSION

For all of the foregoing reasons, the Court is respectfully requested to deny BAE's Motion for Temporary Restraining Order and Preliminary Injunction.

Respectfully submitted,

s/DANIEL J. DULWORTH
BUTZEL LONG, P.C.
150 W. Jefferson Avenue, Suite 100
Detroit, MI  48226
T:  313-225-7098
dulworth@butzel.com
(P41784)
*Attorneys for Defendant Whitesell Corporation*
*and Whitesell International Corporation*

Dated: October 27, 2008

## Certificate of Service

I hereby certify that on October 27, 2008, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to the following:  Marilyn A. Peters, Laura C. Baucus and William J. Hallan.

s/DANIEL J. DULWORTH
BUTZEL LONG, P.C.
150 W. Jefferson Avenue, Suite 100
Detroit, MI  48226
T:  313-225-7098
dulworth@butzel.com
(P41784)

Dated:  October 27, 2008

1036076v2