# EXHIBIT D

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BAE INDUSTRIES, INC., a Michigan
Corporation,

        Plaintiff,

vs.

WHITESELL CORPORATION, an Alabama
Corporation, and WHITESELL INTERNATIONAL
CORPORATION, an Alabama corporation,
Defendants.

Case No. 2:08-cv-14497-AC-DAS
Hon. Avern Cohn

---

## AFFIDAVIT OF STEVE SEMMLER

STATE OF FLORIDA    }
                          }ss
COUNTY OF _____  }

Steve Semmler, being duly sworn, deposes and says:

1. I am the Corporate Vice President of Whitesell Corporation and am duly authorized to make this Affidavit on behalf of Whitesell Corporation and Whitesell International Corporation (together "Whitesell"), and if sworn as a witness can competently testify to the facts stated in this Affidavit. This Affidavit is based upon my own knowledge and my discussions with other employees at Whitesell.

2. In my capacities with Whitesell, I am familiar with virtually every aspect of Whitesell's businesses, including its business transactions and relationships with suppliers.

3. I have been employed by Whitesell since April 2006.

4. BAE is a customer of Whitesell that uses the fastening systems (the "Parts") it buys from Whitesell to produce parts for various automotive platforms.

1

5. Whitesell began supplying the Parts to BAE in August 2006 after Whitesell acquired certain assets of Technifast Industries, Inc. ("TFI").

6. Whitesell did not assume all rights and obligations of TFI, but only certain disclosed and assumed contracts as listed on schedules to the asset purchase agreement. Exhibit A; Exhibit B.[1]

7. After the purchase of the TFI assets, Whitesell contacted BAE via letter in August 2006 and notified it of the purchase, and further stated that it would continue to supply the Parts per the quotation attached to the August 2006 letter. That quotation included price terms, quantities, shipping terms, and payment terms.

8. The quotation submitted to BAE incorporated Whitesell's then applicable terms and conditions. The terms and conditions provided that BAE would pay any charges related to "unanticipated increases in manufacturing costs including, without limitation, increased in costs of material. . . ." Exhibit C, at 5 ¶ 3. Additionally, the terms and conditions stated that Whitesell could "immediately terminate all or any part of this contract, at any time and for any reason, by giving written notice to Buyer." *Id*, ¶ 11.

9. BAE never objected to the August 2006 quotation and accepted it by issuing purchase orders in response to it; Whitesell shipped, and BAE accepted, Parts pursuant to that quotation.

10. BAE's terms and conditions were never transmitted to Whitesell and Whitesell was not otherwise given access to them. According to BAE, its terms and conditions were supposedly available via its website, but the website is password protected and BAE never gave Whitesell the password.

2

11. For months, Whitesell has felt the effects of an unprecedented rise in the price of steel, which has in turn forced Whitesell to raise the price of the goods it manufactures.

12. On May 29, 2008, Whitesell's Matt Johannessen wrote BAE to notify it of the price increase, and simultaneously provided it with a revised quotation along with Whitesell's "General Terms and Conditions of WS as Seller of Products/Services" (the "WS T/Cs"). This quotation was expressly effective 10 days from May 29, 2008.

13. BAE initially ignored Whitesell's need for price relief. BAE eventually proposed that it pay the increased price, but do so under protest. BAE issued a new purchase order on June 17, 2008 that purported to reserve BAE's right to protest the price increase and apply BAE's terms and conditions.

14. In a letter dated June 18, 2008, Whitesell's Steve Naseef requested that the BAE purchase order not be made "under protest" and that BAE agree that the WS T/C's would continue to govern the parties' relationship.

15. That same day, BAE issued a new purchase order, expressly accepting the WS T/C's and the terms of the May 29, 2008 letter, without any reservation.

16. The parties have conducted business pursuant to the May 29, 2008 quotation and the subsequent confirming purchase order since June 18, 2008.

17. In his June 18, 2008 letter, Naseef also invited BAE to discuss entering into a mutually agreeable supply contract with Whitesell.

18. Naseef met with BAE in August 2008 and stated that Whitesell was uncomfortable with the parties' relationship and had heard that BAE was working to resource the business. Naseef informed BAE that Whitesell wanted to discuss a mutually agreeable supply

---

[1] All exhibit references are to the exhibits attached to Whitesell's Response in Opposition to

agreement that would provide BAE financial benefits and incentives over the current terms and conditions and also provide Whitesell comfort to carry-on the relationship. BAE also added that if it wanted to, it could resource Whitesell "at any time."

19. In early September 2008 Whitesell proposed the Supply and Requirements Agreement. In proposing this supply agreement, Whitesell was not requesting any immediate price increase and informed BAE that the proposed agreement was negotiable. Although BAE represented multiple times that it would send Whitesell a marked-up version of the Supply and Requirements Agreement, BAE never did so. BAE's only response to Whitesell about the proposed supply agreement at that time was "you're not on our radar screen."

20. It is Whitesell's belief that before or around this time BAE began resourcing the Parts.

21. The parties were not able to agree to a long-term contract, and on September 23, 2008, Whitesell notified BAE that, because the parties had not agreed to a supply agreement, and because of the parties strained relationship due to the increase in steel prices and BAE's payment defaults, Whitesell was discontinuing the parties' relationship effective October 23, 2008. Whitesell did offer to continue supplying Parts for 30 days if preferred by BAE.

22. Whitesell believed that 30 days was reasonable notice of termination because several of the Parts are generic in nature and replacement suppliers can quickly and easily be retained and because BAE was required to consume all of Whitesell's remaining inventory under the agreement between the parties.

23. After receiving the September 23 letter, BAE's Derek Davis contacted Naseef and stated that BAE did not have time to deal with a new supply agreement, and that BAE would

---

Motion for Temporary Restraining Order.

resource the Parts to a new supplier. Naseef suggested that the parties negotiate during the 30 day period, and Davis appeared to agree and stated that BAE would forward a marked-up agreement.

24. BAE never requested additional time to resource the Parts and never represented that it could not resource the Parts in 30 days. Instead BAE sent Whitesell releases for additional product. This, along with BAE's refusal to negotiate a supply agreement led Whitesell to believe that BAE was accepting the notice of termination.

25. Hearing no objection from BAE, Whitesell began winding down the production of parts for BAE.

26. On October 8, 2008 Whitesell's CFO contacted BAE's CFO to inform her that BAE had been placed on credit hold.

27. On October 9, 2008 I spoke with BAE's CFO. BAE's CFO indicated that BAE may be interested in a supply agreement, but never suggested that BAE needed additional time to resource the Parts.

28. On October 13, 2008 BAE's CFO told Whitesell's Dave Francois that she would speak with BAE's owner concerning the supply agreement that evening and send a draft to me by noon October 14, 2008. No marked-up supply agreement was ever sent to me.

29. Whitesell did not hear from BAE again until the October 21, 2008 letter from its attorney.

30. In the most recent releases sent by BAE to Whitesell, BAE has removed shipments of all but two of the Parts after December 1, 2008. Previously, BAE's releases had covered shipments of all of the Parts through December 2008.

FURTHER AFFIANT SAITH NOT.

_Steve Semmler_

Subscribed and sworn to before me
This 27th day of October, 2008

_Rosanne M. Edgar_
Notary Public

County, Collier

My commission expires _____



**ROSANNE M. EDGAR**
MY COMMISSION # DD769843
EXPIRES March 17, 2012
(407) 398-0153   FloridaNotaryService.com

1036287